2014 OK CIV APP 56

STATE of Oklahoma, DEPARTMENT OF HUMAN SERVICES CHILD SUPPORT SERVICES, Plaintiff/Appellee,

v.

Lafe C. COLDWATER, Defendant/Appellee,

and

Erica Ann Butler, Custodian/Appellant.

No. 110933.

Court of Civil Appeals of Oklahoma, Division No. 3.

May 16, 2014.

Bruce Hammer, Oklahoma Child Support Services, Enid, Oklahoma, for Plaintiff/Appellee.

Jon R. Ford, Enid, Oklahoma, for Defendant/Appellee.

Randy J. Long, Terri K. Blakley, Field, Trojan, Long & Claypole, P.C., Enid, Oklahoma, for Custodian/Appellant.

BAY MITCHELL, Judge.

¶ 1 Custodian/Appellant Erica Ann Butler [1] appeals the decision of the trial court ordering Defendant/Appellee Lafe Coldwater to pay $400 per month in child support, denying her request for child support arrearages, and awarding legal custody of C.M.B., the minor child, to Defendant/Appellee.[2] Custodian/Appellant Erica Ann Butler ("Mother") is the natural mother of C.M.B., a minor child born out-of-wedlock. After the birth of the child, a paternity test determined Defendant/Appellee Lafe Coldwater ("Father") was the father of C.M.B., and Child Support Services filed an administrative action against Father to establish paternity and support obligations.

¶ 2 Prior to the birth of the child, Mother and Father had a sexual relationship, but were not a couple in a traditional sense. Mother lived with her boyfriend at the time, Joshua Guidroz. During her pregnancy, Mother told Father either he or Mr. Guidroz could be the father of the unborn child. C.M.B. was born December 1, 2008, and Mr. Guidroz was listed as the child's father on the birth certificate. Mother later filed a paternity action against Mr. Guidroz, but a paternity test revealed Mr. Guidroz was not C.M.B.'s father. Through an administrative proceeding initiated by Child Support Services, Father was ordered to take a paternity test in May 2010. Father was informed sometime in August or September 2010 that he was the biological father of C.M.B. Pursuant to an order entered by the Office of Administrative Hearings: Child Support, Father was ordered to pay child support to Mother beginning October 1, 2010. Father was not ordered to pay any back child support to Mother for the time period from C.M.B.'s birth through September 2010. Mother did not appeal this administrative order to the district court, and it was docketed in district court pursuant to 56 O.S.2011 § 237.10. Father filed a petition for joint custody on October 15, 2010 using the same district court case number assigned to the docketed administrative order.[3]

¶ 3 The parties agree Mother was the sole care giver for C.M.B. from the time of birth until September 2010 (shortly after Father was informed he was the child's biological

---

1. During the proceedings below, Ms. Butler married and changed her last name to Norman. For ease of reference, we used her previous last name of Butler in our case caption.

2. Defendant/Appellee Lafe Coldwater also filed a counter-petition in error which was later dismissed by the Supreme Court as untimely filed. Because the counter-petition in error was dismissed, we have not referred to the parties as counter-appellant or counter-appellee, respectively.

3. In addition to requesting joint custody, Father's petition also asked the district court to establish a visitation schedule and recalculate Father's child support obligations.

father) when Father began having some visitation with the child. After a temporary order hearing March 3, 2011, the trial court awarded Mother legal and physical custody of C.M.B. subject to Father's visitation on six (6) overnight visits out of every fourteen (14) days. The parties continued this custody arrangement until a trial on the merits was held January 12 and 20, 2012.[4]

¶ 4 Testimony at trial showed the parties generally agreed the physical custody arrangement was working well, but Mother and Father also agreed they had problems communicating with each other. Father felt that Mother made unilateral decisions regarding the minor child without consulting him while Mother felt like Father unnecessarily questioned her parenting skills. Both parents agreed it was in C.M.B.'s best interest if they were both involved in her life.

¶ 5 A *guardian ad litem* ("GAL") was appointed in this case. She presented her report at trial and also testified. Her initial recommendation was that joint custody would not work due to the lack of communication between Mother and Father. She recommended that Father be given legal custody of C.M.B. with each parent having equal physical custody. She based this decision on Father's willingness to work with Mother in parenting C.M.B. and his willingness to maintain C.M.B.'s relationship with her maternal family. The GAL also noted Mother's apparent hostility to having Father involved in C.M.B.'s life because the two fathers of her two other daughters were in no way involved in their lives. After hearing all of the evidence at trial, the GAL changed her recommendation and decided joint legal custody could work if Mother and Father could communicate with each other. The GAL testified that both Mother and Father were capable parents who had C.M.B.'s best inter-

ests in mind. At the conclusion of all the testimony and evidence, including a home study of Mother's house which found Mother's home to be safe, clean, and appropriate, the trial court awarded legal custody to Father but granted the parties equal physical custody of C.M.B. On appeal Mother argues the record does not support the trial court's decision to award legal custody to Father.

¶ 6 The trial court's order also deviated from the child support guidelines by reducing Father's obligation to Mother from the amount calculated by the guidelines of $661.29 per month to $400 per month. Testimony showed Mother works as a physical therapy assistant making approximately $9.00 per hour. Father has a high paying job with an oil field services company. The trial court imputed income to him of approximately $9,000 per month.[5]

To support this deviation, the trial court's order stated:

> Based on the parties' current income, a monthly credit of $800 that is attributed to Mom supporting her two (2) older children, and the arguments of counsel, Dad, as Obligor would normally pay to Mom a monthly child support payment of $661.29 based on the *Child Support Computation Guideline* ...; however, the Court is deviating from the *Child Support Computation* and is ordering Dad to pay Mom monthly child support in the amount of $400.00 per month.

At trial Father testified he could more easily afford to send C.M.B. to private Montessori school if his child support obligations were reduced. On appeal Mother's second proposition is that the trial court failed to comply with the mandate set forth in 43 O.S.2011 § 118H (B) requiring the trial court to justify any deviation with specific findings that such

---

4. Prior to the January 2012 trial, Father obtained a default judgment after Mother failed to answer his petition for joint custody which granted the parties joint legal and physical custody of C.M.B., but designated Father as the final decision maker should any disputes arise regarding the child. Mother then hired counsel who had the judgment vacated. Mother answered Father's petition, and the case proceeded to trial.

5. To calculate Father's imputed income, the trial court considered his monthly salary along with an average of past years' bonuses and stock payments. Father was unable to calculate exactly the amount of bonus and stock payments he would have each year but appears to have no disagreement with the amount of income the trial court imputed to him. This was not one of the issues Father raised in his counter-petition in error which was dismissed by the Supreme Court.

deviation is in the best interests of the minor child and the amount of support under the guidelines is "unjust or inappropriate under the circumstances." Father argues the record supports the deviation even if the specific findings were not included in the trial court's order.[6]

¶ 7 In her answer to Father's petition for joint custody, Mother requested a judgment be entered representing the amount of child support Father owed from the time of C.M.B.'s birth in December 2008 through the time he began paying child support in October 2010. At trial Father argued, and the trial court agreed, Mother's claim was barred by *res judicata* because the matter had been settled in the administrative proceeding where Father argued Mother waived her right to any child support arrearages. Mother argues the record does not firmly establish the matter was litigated in administrative court and, even if it was, she did not knowingly waive her right to child support arrearages as she was unrepresented by counsel at the administrative level. Mother's third appellate argument is that the trial court erred in the denial of her request for payment for child support arrearages.

## LEGAL CUSTODY OF C.M.B.

¶ 8 "On appeal, this Court will not disturb the trial court's judgment regarding custody absent an abuse of discretion or a finding that the decision is clearly contrary to the weight of the evidence." *Daniel v. Daniel,* 2001 OK 117, ¶ 21, 42 P.3d 863. The burden is on the appealing party to show that the decision is "erroneous and contrary to the child's best interests." *Id.* "Absent such a showing, the trial court's determinations are presumptively correct." *Shaw v. Hoedebeck,* 1997 OK CIV APP 69, ¶ 11, 948 P.2d 1240 (citing *Carpenter v. Carpenter,* 1982 OK 38, 645 P.2d 476). We give deference to the trial court in reviewing custody decisions because it "is better able to determine controversial evidence by its observation of the parties, the

witnesses and their demeanor." *Hoedebeck,* 1997 OK CIV APP 69, ¶ 10, 948 P.2d 1240.

¶ 9 Mother argues the trial court awarded Father legal custody of C.M.B. to avoid having to require Father to pay child support to Mother and despite the fact he ignored his paternal obligations until he was required to submit to a paternity test per court order. Mother insists there was nothing in the record to show it was in C.M.B.'s best interests that Father be granted legal custody.

¶ 10 We disagree with Mother's interpretation of the facts and record. First, the trial court ordered Father to pay child support negating Mother's first argument. Second, the record does not show Father ignored his paternal obligations until ordered to submit to a paternity test. Rather, Father had little reason to suspect he was the father of C.M.B. even after Mother told him it was a possibility. Mother had been living with another man around the time of conception. This man was listed as the father on the birth certificate and a paternity suit had also been filed against him. We recognize there is no dispute that Father was not involved in C.M.B.'s life until she was approximately eighteen (18) months old, but once Father confirmed his paternity of C.M.B., by all accounts he became an active and involved parent.

¶ 11 Our review of the record shows the trial court placed great weight on its belief that Father was the best party to follow court orders and encourage a relationship with the other parent when deciding to grant legal custody to Father. Given our duty to defer to the trial court's consideration of witnesses and evidence, we cannot say this decision was clearly contrary to the weight of the evidence. We affirm the trial court's award of legal custody to Father.

## CHILD SUPPORT DEVIATION

¶ 12 Oklahoma law provides for a rebuttable presumption that the amount of

---

6. In his reply brief, Father contends the following facts support the trial court's deviation: Mother's previous receipt of public assistance, the increased household income due to Mother's marriage to Joshua Norman, free child care provided by paternal grandparents, and the child's young age. However, our review of the record shows these facts were not argued during the trial on the merits.

child support calculated by the child support guidelines is the correct amount of child support to be awarded. 43 O.S.2011 § 118(A). Section 118H (B) provides the trial court "may deviate" from the amount of support indicated by the guidelines "if the deviation is in the best interests of the child and the amount of support so indicated is unjust or inappropriate under the circumstances." Should the trial court deviate from the child support guidelines, it is required to "make specific findings of fact supporting such action." 43 O.S.2011 § 118H (C) ("[T]he court *shall* make specific findings of fact supporting such action.") (Emphasis added.) The findings of fact must include the following:

1. The reasons the court deviated from the presumptive amount of child support that would have been paid pursuant to the guidelines,

2. The amount of child support that would have been required under the guidelines if the presumptive amount had not been rebutted, and

3. A finding by the court that states how, in its determination:

 a. the best interests of the child who is subject to the support award determination are served by deviation from the presumptive guideline amount, and

 b. application of the guidelines would be unjust or inappropriate in the particular case before the tribunal.

43 O.S.2011 § 118H (C). Under the child support guidelines, Father's child support obligation to Mother was $661.29 per month. The trial court reduced this amount to $400.00 per month but failed to make specific findings of fact justifying the deviation as required by 43 O.S.2011 § 118H (C). Thus, this portion of the trial court's order must be VACATED and REMANDED for a determination of whether such facts exist to support the deviation, and, if so, to articulate them as required by statute. *See Kingery v. Kingery,* 2011 OK CIV APP 122, ¶¶ 16–20, 270 P.3d 192 (reversing and remanding a child support order which deviated from the guidelines for omission of judge's signature and for not including factual findings explaining how the child support obligation was derived).

## CHILD SUPPORT ARREARAGES

■■■ ¶ 13 Mother's allegation the trial court erred by finding her claim for child support arrearages was barred by *res judicata* depends on whether the issue was or could have been litigated at the administrative level.[7] The doctrine of *res judicata,* now commonly referred to as "claim preclusion," bars relitigation of issues by parties or their privies which were or could have been raised in a previous proceeding which resulted in a prior judgment on the merits.[8] *State ex rel. Moshe Tal v. City of Oklahoma City,* 2002 OK 97, ¶ 20, 61 P.3d 234. "The party against whom it is interposed … must have had a full and fair opportunity to litigate the claim or critical issue." *Id.* "Oklahoma's jurisprudence has foreshadowed a willingness to apply preclusion doctrine to final adjudicative *administrative* decisions if appropriate and not subject to some recognized exception." *Feightner v. Bank of Oklahoma, N.A.,* 2003 OK 20 ¶ 13, 65 P.3d 624 (emphasis added).[9]

---

7. The question of whether claim preclusion applies can be a question of law or a mixed question of law and fact. *Feightner v. Bank of Okla., N.A.,* 2003 OK 20, ¶ 3, 65 P.3d 624. "It is solely a question of law if (1) the facts are undisputed, (2) the preclusion question can be answered solely by reviewing the judgment put forward as the bar, or (3) the preclusion determination can be made solely by inspection of the record of the proceeding(s) culminating in the judgment put forward as the bar. [A] deferential standard of review applies to resolutions of disputed facts when supported by reasonable evidence; an independent judgment standard of review applies to the ultimate conclusion that these facts do or do not trigger preclusion." *Id.* (internal citations omitted).

8. We note Father's petition requesting joint custody also asked the district court to recalculate his support obligations. While the issue of current and ongoing support obligations was addressed by the administrative order, the doctrine of claim preclusion does not apply to this issue. Mother, Father, and DHS all retain the ability to request modification of support obligations on a prospective basis so long as the child is entitled to parental support. 43 O.S.2011 §§ 112(E), 118I, 118.1(A).

9. "[O]ne recognized exception is when there is a statutory intent or directive to the contrary." *Feightner,* 2003 OK 20, ¶ 14, 65 P.3d 624. The *Feightner* Court found no statutory exception existed in the statutes providing for administrative

*See also Dority v. Green Country Castings Corp.*, 1986 OK 67, 727 P.2d 1355 [10]; *Bostwick v. Atlas Iron Masters, Inc.*, 1988 OK CIV APP 20, 780 P.2d 1184.[11] "[A] person who has once actually administratively litigated his claim, fully and fairly ... and lost, may not then move to a different forum and successively litigate the same claim or issue again outside the confines of normal judicial review of administrative decisions." *Feightner*, 2003 OK 20, ¶ 18, 65 P.3d 624.

 ¶ 14 Mother argues the issue was not litigated at the administrative level and that she did not knowingly waive her right to child support arrearages because she was not represented by counsel at the time. Thus, she argues, the doctrine of claim preclusion cannot prevent her for making her claim at the district court. However, Oklahoma law

does not support the *pro se* exception Mother argues. *Pro se* litigants are held to the same standard as an attorney. *Funnell v. Jones*, 1985 OK 73, ¶ 4, 737 P.2d 105. Further, Oklahoma's statutory child support enforcement scheme shows Mother was given the opportunity to litigate the issue of child support arrearages at the administrative level. Failing to do so bars Mother from later making her claim in district court.

¶ 15 The Oklahoma Department of Human Services ("DHS") is the state agency responsible for administering the child support enforcement program for the State of Oklahoma. 56 O.S.2011 §§ 237(A), 237.7(1). Oklahoma law gives DHS the authority to conduct child support enforcement administrative proceedings through the Office of Administrative Hearings: Child Support

hearings at the Oklahoma Department of Labor. *Id.* at ¶¶ 17–19. The Court applied the preclusion doctrine to bar a plaintiff from pursuing her claim for unpaid overtime compensation in a suit in district court when the matter had been fully litigated and decided against her favor at the administrative level. *Id.* at ¶¶ 12–19. The Court concluded the administrative relief "was to be an alternative one in nature and ... an individual with a wage claim enforceable in both administrative and judicial forums would not be mistakenly required to exhaust the former to gain access to the latter." *Id.* at ¶ 17. "Exhaustion of administrative remedies is normally a prerequisite for resort to the courts in matters involving adjudicative administrative proceedings subject to the [Oklahoma Administrative Procedures Act, 75 O.S. § 250, *et seq.*]." *Feightner*, 2003 OK 20, ¶ 17, 65 P.3d 624 (internal citations omitted).

**10.** In addition to finding the National Labor Relations Act ("NLRA") did not preempt aggrieved employees' state statutory retaliatory discharge claims, the Supreme Court held the NLRA allowed aggrieved employees to recover cumulative and supplemental remedies. *Dority*, 1986 OK 67, ¶¶ 6–11 and 12–14, 727 P.2d 1355. The aggrieved employees were successful in their administrative claims before the National Labor Relations Board. *Id.* at ¶ 12. The Supreme Court concluded this prior administrative adjudication did not bar the employees' pursuit of remedies in state court because the state court claims "[did] not disturb the scheme of remedies affordable by the administrative tribunal." *Id.* at ¶ 13.

**11.** In *Bostwick*, 1988 OK CIV APP 20, ¶ 2, 780 P.2d 1184, plaintiff suffered a work-related injury resulting in approximately four months of medical leave. Plaintiff filed a worker's compensa-

tion claim against his employer and was discharged from his position upon returning to work. *Id.* Plaintiff filed an administrative claim for unemployment benefits with the Oklahoma Employment Security Commission ("OESC") which denied his claim concluding plaintiff was dismissed for cause. *Id.* at ¶ 3. Plaintiff did not appeal the OESC's findings but later filed a retaliatory discharge claim under the workers' compensation code in district court. *Id.* The Court of Civil Appeals ("COCA") concluded the adverse OESC administrative ruling did not bar his retaliatory discharge claim because the remedies differed between the two. *Id.* at ¶ 5. "The remedy affording by OESC [was] limited to receipt of unemployment benefits ... and applie[d] where employee is unemployed through no fault of his or her own." *Id.* However, the remedy afforded by a successful retaliatory discharge claim "should be viewed as collateral rather than incidental to claims for bodily injury or unemployment benefits. Furthermore, recovery [for a retaliatory discharge claim] is not barred where there is more than one reason for employee's discharge [including dismissal for cause] so long as retaliatory motivations comprise a significant factor in the decision to terminate." *Id.* Plaintiff was allowed to pursue his retaliatory discharge claim but was bound by OESC's findings of fact regarding the cause for his dismissal. *Id.* at ¶ 8. "[S]ubject to adequate opportunity for administrative review, resolution of a disputed issue of fact properly before the OESC should be allowed the same effect as such finding in a judicial review would be entitled by statute." *Id.* at ¶ 8. COCA noted administrative proceedings required procedural due process but that "no particular form of procedure is dictated, and failure to avail oneself of the full procedures provided by state law does not constitute inadequacy of such procedures." *Id.* at ¶ 9.

("OAH").[12] *Id.* at § 237.7(3). Such hearings are conducted before administrative law judges ("ALJ"). *Id.* at § 237.7(3). After evidence has been presented at an administrative hearing, the ALJ shall enter a written order containing findings of fact and conclusions of law as to each contested issue. *Id.* at § 237.8. OAH is authorized to issue orders detailing the current support obligation and past due support obligations. *See id.* at § 237A(A)(2). Final orders shall be appealable directly to the district court in the same manner as provided in the Oklahoma Administrative Procedures Act. *Id.* at § 240.3(A)(1). *See also* 75 O.S.2011 §§ 318–323. *But see Dept. of Human Services v. Hernandez,* 2003 OK CIV APP 35, ¶ 3, 68 P.3d 229.[13] Such administrative orders shall be docketed in the district court and "shall be enforced by the district court in the same manner as an order of the district court." 56 O.S.2011 § 237.10.[14] *See also* Okla. Admin. Code § 340:2–28–50.

¶ 16 The administrative order in the record is a pre-printed form with handwritten entries to complete the required information. The order confirms the paternity of Father and orders him to pay child support in the amount of $756.25 per month starting October 2010. Paragraph 8 provides a blank space for a judgment to be entered against Father for any past due support for the time period preceding October 2010. The term "N/A" is entered in this space. Whether this entry shows the issue was litigated before the administrative court and no support was ordered or whether it shows the issue was not presented at the administrative level is irrelevant. The issue *could have been* litigated at the administrative hearing.

¶ 17 We see no reason why an analysis similar to that applied in *Feightner* and *Bostwick, supra,* should not apply to the case at bar. The administrative order entered by OAH addressed the issues of paternity and support obligations and was thus a "final" order within the meaning of § 240.3(A)(1).[15] No other issues remained to be litigated between the parties at the administrative level. *See* footnote 12, *supra.* Because DHS was providing child support services to Mother, the claim was appropriately pursued at the administrative level.[16] 56 O.S.2011

12. Notably, OAH does not have jurisdiction to determine child custody. That duty remains solely within the jurisdiction of the district courts. *Compare* 56 O.S.2011 §§ 237(A), 237.7(3) and 75 O.S.2011 § 308a with 43 O.S. 2011 § 551–201.

13. In *Hernandez,* 2003 OK CIV APP 35, ¶ 1, 68 P.3d 229, the putative father appealed an administrative order to the district court which affirmed the administrative order establishing paternity of the child but leaving unresolved the issue of support obligations even though DHS had requested a child support order in its application to OAH. The putative father then appealed the district court order to the Supreme Court. *Id.* Once assigned to the Court of Civil Appeals ("COCA"), COCA found the trial court had no jurisdiction to consider putative father's administrative appeal because the order was not a final order within the meaning of 56 O.S.2001 § 240.3(A)(1) or 75 O.S.2001 § 318(A)(1). *Id.* at ¶¶ 3–4. Because the administrative order did not address putative father's support obligations, it did not resolve all the issues arising out of the controversy between the parties depriving the district court of appellate jurisdiction. *Id.* at ¶¶ 3–4.

14. The plain reading of the statute requires the final administrative order to be filed with the district court even when the aggrieved party appeals the administrative order to district court.

56 O.S.2011 § 237.10 ("Administrative orders entered pursuant to this title shall be docketed in the county of the underlying district court order, if any.").

15. While OAH is authorized to enter orders addressing prior support obligations, no statutory authority or case law mandates an administrative order do so in order to be a final order within the meaning of § 240.3(A)(1). However, the order must address both paternity and, at the very least, current support obligations to be a final order. *Hernandez,* 2003 OK CIV APP 35, ¶¶ 1–3, 68 P.3d 229.

16. OAH child support administrative proceedings are not exactly an alternative remedy nor are they supplemental to or cumulative to using a judicial forum to establish child support obligations. Rather, the two forums can be said to have concurrent jurisdiction over the subject matter. *See Scungio v. Scungio,* 2012 OK 90, ¶ 11, 291 P.3d 616. *See also* 43 O.S.2011 § 112(E) (providing "any child shall be entitled to support by the parents until the child reaches eighteen (18) years of age"); 10 O.S.2011 § 7700–103 (authorizing both district and administrative courts to adjudicate parentage under the Uniform Parentage Act, 10 O.S.2011 § 7700–101, *et seq.*). Mother's action against Father to establish paternity and support obligations was

§ 237(B)(3). Mother had the opportunity to request a judgment for prior support obligations at the administrative level but either failed to present the issue or was otherwise denied such a judgment. Mother did not appeal the administrative order to the district court. 56 O.S.2011 § 240.3(A)(1). Once she failed to appeal, her right to a review of the issues addressed by the administrative order ended. *See* 75 O.S.2011 §§ 318, 323. Similar to the proceedings in *Feightner* and *Bostwick,* the administrative remedies available to Mother were not her only means of seeking relief, but once she pursued administrative remedies through OAH, she was bound by those procedures. *See Feightner,* 2003 OK 20, ¶¶ 17–19, 65 P.3d 624; *Bostwick,* 1988 OK CIV APP 20, ¶¶ 8–9, 780 P.2d 1184.

¶ 18 Oklahoma's child support enforcement scheme does not provide a statutory exception to giving OAH decisions preclusive effect. Rather, it establishes procedures to appeal from an adverse administrative decision, 56 O.S.2011 § 240.3(A)(1), and states such decisions "shall be enforced by the district court in the same manner as an order of the district court." *Id.* at § 237.10. These appeal procedures were the appropriate ave-

nue for Mother to pursue judicial review of the denial of her claim for child support arrearages. *See Feightner,* 2003 OK 20, ¶ 18, 65 P.3d 624. The doctrine of claim preclusion, the purpose of which includes "conserv[ing] judicial resources and prevent[ing] inconsistent decisions," *id.* at ¶ 15, prohibits Mother from presenting the same issue in a different forum. *Id.* at ¶ 18. The trial court correctly barred Mother from relitigating the issue of child support arrearages in the district court action because the issue could have been litigated at the administrative level.

¶ 19 Consistent with the foregoing, the decision of the trial court is AFFIRMED IN PART, VACATED IN PART AND REMANDED FOR FURTHER PROCEEDINGS consistent with this opinion.

BELL, P.J., and GOREE, J., concur.

---

pursued at the administrative level through DHS, but Mother could also have pursued an action to

establish paternity and support obligations in district court.